BENJAMIN F. WARNER *vs.* MAINE CENTRAL RAILROAD COMPANY & Tr.

GEORGE B. WARNER *vs.* SAME.

MARY JACQUES *vs.* SAME.

BERTHA WARNER *vs.* SAME.

MONA WARNER, Pro Ami, *vs.* SAME.

Androscoggin.    Opinion March 1, 1915.

*Damages.    Engine.    Fire.    Insurance.    Locomotive.    R. S., Chap. 52, Sec. 73.*

These actions were tried together. They were brought under the provisions of Sec. 73, Chap. 52, R. S., to recover damages for the loss of certain buildings, and personal property therein contained, by fire alleged to have been communicated by a locomotive of the defendant.

Verdicts were returned for the plaintiffs as follows: for Benjamin F. Warner $753.50, for George B. Warner $546.47, for Mary Jacques $65.74, for Bertha Warner $58.65, for Mona Warner $99.22. The cases are before the Law Court on defendant's motion for a new trial.

*Held:*

1. That there was testimony which, if believed, was sufficient to support a jury finding that the fire was caused by sparks from the defendant's railroad locomotive.

2. That it does not appear to the court that the damages awarded in either case are excessive.

3. That after full consideration of all the evidence the court is not led to the conclusion that the verdicts are so manifestly erroneous that they should be set aside.

On motions by defendant.  Motions overruled.

These actions on the case were brought under R. S., Chap. 52, Sec. 73, to recover damages for the loss of certain buildings and personal property therein, by fire alleged to have been communicated to said buildings by a locomotive belonging to and in control of the defendant.  Plea, general issue.  The cases were tried together and verdicts were rendered in each case in favor of plaintiff.  The defendants each filed a motion for a new trial.

The cases are stated in the opinion.

*Ralph W. Crockett,* for plaintiffs.

*White & Carter,* for defendants.

SITTING:  SPEAR, CORNISH, KING, BIRD, HANSON, JJ.

KING, J.  These actions were tried together.  They were brought under the provisions of Sec. 73, Chap. 52, R. S., to recover damages for the loss of certain buildings, and personal property therein contained, by fire alleged to have been communicated by a locomotive of the defendant.

The first action, that of Benjamin F. Warner, is for damages for the loss of the buildings burned; the second, that of George B. Warner, for damages for the loss of the contents of the buildings, consisting of a stock of merchandise, store fixtures, household furniture, etc.; and each of the other three actions is for damages for the loss of articles of personal property, owned by the respective plaintiffs, and contained in the buildings at the time of the fire.  The insurance on the buildings having been paid the jury deducted the amount thereof from the damages to the buildings and returned a verdict in favor of Benjamin F. Warner for $753.50.  Likewise the jury deducted from the damages to the stock of merchandise, household furniture and fixtures the amount of the insurance thereon received and returned a verdict in favor of George B. Warner for $546.47.  In the other three cases the verdicts were, for Mary Jacques $65.74, for Bertha Warner $58.65, for Mona Warner $99.22.  The cases are now before this court on defendant's motions for a new trial, and the only question urged is that of liability.

The buildings burned were situated at Leeds Junction Station, so called, in the town of Wales, Maine.  The highway at that point

extends substantially north and south, and the main tracks of the defendant's railroad cross the highway nearly at right angles to it— apparently in a course of east about 30° north. The passenger station is on the northerly side of the tracks and just west of the crossing. East of the crossing and near it the track of the Farmington branch diverges northerly from the main line. The Warner buildings were situated on the easterly side of the highway, northerly of and near to the railroad. They consisted of a dwelling-house, store and barn, all connected, and being situated in the order named going north from the railroad. The barn stood end to the highway with gable roof. It was claimed by the plaintiffs that the fire caught on the southerly side of the roof of the barn, the side pitching toward the railroad. The defendant's civil engineer, Swift, gave the distance from the center of the barn to the nearest point in the Farmington branch as "about 90 feet," and Mr. Warner gave the distance from a point on the ground, beneath where he claimed the fire caught on the roof, to the nearest point of the railroad as 91 feet. The crossing of the highway and railroad appears to be a little west of a line extending south from a point at the center of the barn, and about 140 feet from that point. And the passenger station appears to be in a southwest line from the same point at the barn.

The case shows that on Sunday afternoon, October 6th, 1912, a train of 25 cars loaded with pulp-wood, going from Portland to Livermore Falls (a station on the Farmington branch) arrived at Leeds Junction from the west at 3.45 o'clock. It stopped on the hill west of the station, Leeds Junction being "in a sag or hollow," the grade from the station going east on the Farmington branch being 47 feet to the mile. The engine was cut from the train and went down to the stand-pipe east of the crossing for water. Two more cars were picked up there from a side track, after some necessary shifting, and pushed back and joined to the other cars on the hill. The train was first booked out of Leeds Junction at 4.25. But after passing beyond the crossing some five or eight hundred feet it was flagged on account of a gravel train headed west on the same track. The pulp-wood train then backed back far enough to let the gravel train clear the block and at 4.40, according to the register, pulled out east over the Farmington track. The engineer testified that when he started his engine the second time it was located at about the lowest point in the yard, and that it labored hard, at its full capacity,

in pulling the train up the grade.   Mr. Warner's testimony would indicate that the engine when it started the second time was near the crossing—or between the crossing and the station.

The fire was first discovered by Mona Warner, probably at about 5.45 P. M.   She went out into the store first that afternoon after paper to write a letter, and saw no indications of fire then, "but after I came back and had written the letter I went out after envelopes and I heard a sort of roaring sound, and I ran out in the middle of the store, and then I went to the roll-way door.   It came from the stable. I went over there and looked and saw the reflection of the flames, up through the pitch hole, in the top of the barn,   .   .   .   then I ran into the dining room and hollered 'fire.' "   She then ran over to the station giving the alarm.   The "roll-way door" through which she looked was between the store and barn, a little more than half way from the front to the back of the store.   She did not remember whether that door "was open already or I pushed it open."   Mr. Warner, at the alarm of fire, hastened from the dining room through the store into the barn, and looking up through the pitch hole saw a hole burned through the roof and the hay and straw on fire.   Others who gathered there quickly observed the same conditions.   The buildings were soon totally destroyed.

1.   It is a contention of the defendant, in support of its motions that the fire originated inside of the barn—in the barn chamber or hay-loft.   And that is an important and fundamental proposition involved in the case, because, if the fire did originate inside of the barn, then there is no claim that it was communicated there by the defendant's locomotive.

But after a careful study of the record the court is led to the conclusion that the evidence is sufficient to justify a finding by the jury that the fire did not originate inside of the barn, but caught on the outside of its roof, the side toward the railroad.

There is ample testimony showing that when the fire was first discovered it had burned a hole through in one place on the southerly roof of the barn.   The witnesses who went into the barn immediately after the alarm was given testified to seeing that particular hole as they looked up through the "pitch hole."   Mr. Warner, who was first there after Mona, described it as "four or five feet" in size; Mr. Hayes, as "four or five feet   .   .   .   across it;" Mr. Richards, as "two or three feet may be, a jagged hole, it wasn't square nor round;"

Mr. Philbrick, called by defendant, as "five or six feet." Mr. Warner testified on cross-examination that the inside of the roof of the barn was not on fire when he looked up through the pitch hole, except where this hole was burned through, but that the hay and straw in the loft was then on fire. And he and other witnesses testified that when the outside door was opened a strong draft of air went up through the pitch hole and the whole top of the barn was soon in flames. After Mr. Warner first saw the condition of the fire—the hole burned through the roof and the hay and straw in the loft on fire—he "run in through the store out into the street, and hollered 'fire' . . . and went towards Hayes' house and hollered 'fire.'" He then "came back through the store and cut the rope halter to get the horse out." There were three stalls on each side of the barn with a hay chute for each extending down from the hay-loft. The horse was in the middle stall on the north side. There was no fire whatever in the lower part of the barn at the time the horse was taken out, except that some particles of burning hay were then dropping down through the hay chutes and other "open places." It was while Mr. Warner was getting the horse out that Mr. Hayes and Mr. Lynch opened the outside barn door causing the draft up through the pitch hole.

If the fire originated in the hay-loft, and had burned there long enough, and had increased to an extent sufficient, to have burned the hole through the roof as described by the witnesses, then it is quite difficult to believe that it would not have been communicated to the lower part of the barn through the pitch hole, the hay chutes, and the other "open places." On the other hand, the fact that when the fire was discovered that hole of "four or five" feet in size had been burned through the south side of the roof, with the rest of the roof apparently not much, if any, involved, the hay and straw being then on fire, but no fire up to that time having been communicated below the hay-loft, is, we think, consistent with, and reasonably justifies, the conclusion that that hole was burned through the roof from the outside, and that the hay and straw caught fire from sparks and embers falling upon it as the fire worked down through the roof. No one had been in the upper part of the barn or hay-loft since the preceding Friday, and there was no evidence tending in any way to account for the origin of the fire up there.

2.   It is also urged by the defendant that the direction of the wind was not such as to carry sparks and cinders from its locomotive over and upon the Warner buildings, and the defendant's witnesses for the most part testified that the direction of the wind was parallel with the track.   On the other hand, Mr. Warner testified that the wind was south, blowing right up the highway; Mr. Hayes, that it was blowing diagonally from the track to the buildings; Mr. Richards, that it was a little west of south blowing diagonally from the track towards the buildings; Mr. Stetson, that it was from a general southerly direction, a little west of south.   But the jury had other testimony which, if believed by them, established beyond doubt the fact that the direction and strength of the wind was such as to carry smoke and cinders from the passing locomotive over and upon the Warner buildings.   Mr. Warner testified, in substance, that he saw from his window the train back down westerly from the Farmington track to the station, and that when it started again going east the engine was working so hard and making so much noise that he went onto his veranda towards the track and watched the engine pull by his house up the grade, and that it was throwing out smoke and cinders to a "large extent," and that he then heard the cinders falling on his buildings.   "I could hear them strike on the roof."   Mr. Hayes also testified that smoke and cinders came from the train over and upon his premises which were situated 65 to 70 feet directly north of the Warner barn.

3.   The defendant further contends that the finding by the jury that the fire was communicated from its locomotive in question was not justified in view of the evidence it introduced showing that the locomotive was equipped with an approved spark arrester in good condition which, in the opinion of its witnesses, would have prevented the emission of sparks that could have set the fire.

The essential feature of a spark arrester appears to be a steel wire mesh netting placed in the forward end of the smoke arch of the engine so that nothing can get from the fire box to the open air through the smoke-stack without passing through this netting.   Its purpose is to break up the large pieces of burning coal and cinders before they pass into the smoke-stack—in other words, to arrest the emission of live sparks and burning cinders of any considerable size, and thereby reduce the chance of fires being communicated by the

engine to adjoining property. But everyone who has observed, especially in the night time, a locomotive engine working hard has probably noticed live sparks and glowing cinders coming from its smoke-stack. The size of those sparks and cinders necessarily depends on the size of the mesh of the spark arrester with which the engine is equipped. Any spark or cinder that can be forced through the mesh of the netting may come out of the smoke-stack. There is nothing else to stop it. The netting used on the engine in question was exhibited in court, having been taken from the engine the morning after the fire for that purpose, and the jury saw the size of the mesh. And it was conceded at the trial that a locomotive engine has the inherent capacity under certain conditions of setting fires to adjoining property from sparks emitted from its smoke-stack. And there was evidence that fires had been communicated by defendant's engines to the railroad buildings and structures near the tracks at Leeds Junction, and, further, that in one instance an engine communicated fire to the roof of the Philbrick barn situated easterly of the Warner buildings on the same side of the tracks and apparently about the same distance therefrom. And Mr. Warner testified, as already noted, that the engine in question when pulling by his house just before the fire did emit sparks and cinders that came over and upon his buildings, and that he "could hear them strike on the roof." Without discussing further in detail the evidence bearing on this contention of the defendant it is sufficient to say that the court is not satisfied that the jury erred in finding that sparks and cinders did come from the engine capable of being carried to, and of setting fire to, the Warner barn.

4. Lastly, the defendant contends that the jury erred in finding that the fire was communicated from the engine to the roof of the barn, in view of the evidence that at least an hour elapsed after the train passed before the fire was discovered, during which time no fire was observed on the roof of the barn by anyone, although witnesses testified that they were in position where they could have seen a fire there. The argument of the learned counsel for the defendant is persuasive. We are much in doubt on this proposition. And yet, after full consideration of the evidence, we are not convinced that the communication of the fire from the engine to the roof of the barn may not be a reasonable inference from all the facts and circumstances, notwithstanding the evidence of the length of time that

elapsed after the engine passed before the fire was discovered by Mona from the inside of the barn. If a spark lighted on the roof it might have smouldered there for some time before being fanned into much flame, and after that it would necessarily take some time before such a hole as was described could be burned through the roof. Who can determine the limit of that time? The testimony of the witnesses that they did not see a fire on the roof, though in a position to have seen it, does not conclusively show that the fire was not there.

5. We do not understand that the defendant really urges as a ground for its motions that the damages are excessive. It is sufficient to say, however, that it does not appear to the court that the damages awarded in either case are manifestly excessive.

It is therefore the opinion of the court after full consideration of all the evidence, that it does not clearly appear that the verdicts are so manifestly erroneous that they should be set aside.

*Motions overruled.*